SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:18-cr-00103 |
| | § | |
| MARCELLE DA ROCHA GUIMARAES, | § | |
| CARLOS OTAVIO GUIMARAES, and | § | |
| JEMIMA DA ROCHA GUIMARAES | § | |

## DEFENDANTS CARLOS OTAVIO GUIMARAES AND JEMIMA DA ROCHA GUIMARAES'S JOINT MOTION TO DISMISS THE INDICTMENT

The Indictment of Defendants Carlos and Jemima Guimaraes is the Government's attempt to use two grandparents as pawns in a civil international custody dispute. Even if one ignores the ethical questions raised by this prosecution, the Indictment is unlawful because it does not state an offense and it is prohibited by defenses that this Court may determine as a matter of law.

Pursuant to Rules 12(b)(1) and 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure, Mr. & Mrs. Guimaraes respectfully request that this Court dismiss the case against them. Mr. & Mrs. Guimaraes assert a legal defense uncontroverted by any facts: The removal and retention of their grandson in Brazil is not a prosecutorial offense against these grandparents. No facts exist to demonstrate that Mr. & Mrs. Guimaraes had the legal ability to, or did, make any determinations about their grandson's travel or residence. Additionally, this Indictment fails to state an offense in this case because 18 U.S.C. § 1204(d) prohibits the prosecution of Mr. & Mrs. Guimaraes under § 1204(a).

## I.    BACKGROUND

The factual basis for this criminal case relates, in part, to proceedings in the Harris County divorce and child custody case of Marcelle Da Rocha Guimaraes ("Ms. Guimaraes"), the adult daughter of Mr.& Mrs. Guimaraes. In 2012, Ms. Guimaraes filed for divorce from Christopher Brann and sought custody of the couple's son. Her parents were not a party to that proceeding.

With the divorce case pending, the couple shared custody of the child,[1] which permitted Ms. Guimaraes to decide the child's home within Harris County.  In summer 2013, the couple executed a court-approved contract, known as a "Rule 11 Agreement" (the "Agreement").  Under the Agreement, Ms. Guimaraes could take the child to Brazil, where she is a citizen,[2] to attend a family wedding.[3]  Ms. Guimaraes was to return with the boy by July 20, 2013.  She did not do so.

On July 22, 2013, a Brazilian state court in Bahia, awarded Ms. Guimaraes primary custody of her child.[4]  On August 4, 2013, Ms. Guimaraes's divorce attorney in Texas informed Mr. Brann's counsel that Ms. Guimaraes and the child would remain in Brazil.  Mr. Brann immediately notified Ms. Guimaraes that he sought to intervene in the Brazilian proceedings via the Hague Convention.[5]  Mr. Brann returned to the Texas courts and obtained an order awarding him sole custody of the child in the United States while his Hague Convention request proceeded in Brazil.

When Mr. Brann commenced proceedings under the Hague Convention, he sued his wife[6] and asked a Brazilian federal judge for a preliminary injunction that ordered his son's immediate return to the United States.[7]  Mr. Brann's assertions about Mr. Guimaraes in that lawsuit are similar to the Government's claims in the Indictment.[8]

---

[1]   Exhibit 3, Agreed Temporary Orders.

[2]   Mr. & Mrs. Guimaraes also have citizenship in Brazil and the United States.

[3]   Exhibit 4, Rule 11 Agreement, dated May 24, 2013.

[4]   Exhibit 5, Interlocutory Decision, dated July 22, 2013.

[5]   Exhibit 6, letter from Jeremy Morley to Marcelle Guimaraes, dated August 6, 2013.

[6]   Exhibit 7, Brann Hague Petition.  Mr. Brann also named Mr. Guimaraes in the proceeding as a defendant.  The Brazilian Court dismissed Mr. Guimaraes from the lawsuit as the court lacked jurisdiction over him for these claims.

[7]   Exhibit 1, Brazilian Federal Judge Duarte's Order, dated October 29, 2013.

[8]   Exhibit 2 p. 3; see also Exhibit 6.

On October 29, 2013, the Brazilian federal court denied Mr. Brann's injunctive request and ordered the child to remain with his mother.[9]  Based on pleadings and evidence, the federal judge found:

- Mr. Brann had admitted to reacting "explosively" by "breaking furniture and electronic devices," destroying walls, and assaulting [Ms. Guimaraes], "even in front of the minor";[10]

- Mr. Brann had admitted he was a sex-addict who could not control his compulsion or violent mood swings;[11]

- Mr. Brann had demonstrated he was "psychologically unstable, lacking self-control, violent and suffering from a psychiatric disease that renders him incapable of being with the minor without supervision since he surrenders to his [sex] addiction at the expense of other tasks or social situations."[12]

The Brazilian federal judge concluded "[there is] evidence that there is risk of [the child] being subject to physical or psychological harm if he returns to the USA and starts living under the custody of his father, away from his mother."[13]  The federal court permitted Mr. Brann to see the boy in supervised visits.  The court also found that the state court in Brazil had jurisdiction over the custody matter.

After denying Mr. Brann's injunctive request, the federal court then fully reviewed the case on its merits.[14]  The judge conducted evidentiary proceedings, including depositions of Mr. Brann and Ms. Guimaraes.  Additionally, the court reviewed hundreds of pages of documentary evidence

---

[9]   Exhibit 1.

[10]   *Id*. at 4.

[11]   *Id*. at 4.

[12]   *Id*. at 4.

[13]   *Id*. at 4.

[14]   The court's opinion begins with a recitation of the parties' positions and factual assertions, and the various procedural rulings in the case prior to July 2015.  The judge's decision commences on page 13 of Exhibit 2.

including letters, filings and depositions from the Texas proceedings, expert reports, and medical records.  In July 2015, the Brazilian judge denied Mr. Brann's request for the return of his son.

In her opinion, the federal judge considered the Hague Convention about the Civil Aspects of International Child Abduction.[15]  She also noted that the proceeding would decide whether the child should be immediately returned to the United States for further custody proceedings, and whether the Brazilian state court had jurisdiction to decide custody.[16]  The court found that Ms. Guimaraes had remained in Brazil past the Agreement's July 20, 2013 deadline. But the court excused this under two exceptions recognized under the Hague Convention: 1) The evidence proved "the child is already integrated into his new environment" and, 2) "there [was] serious risk of the child being subject to physical or psychic dangers" if he returned to the United States.[17]

The judge also noted the evidence demonstrated:

- A specific threat of domestic violence that Mr. Brann presented to his wife and child. [18]   The court noted certain acts committed by Mr. Bran, some of which had occurred during the couple's separation or divorce proceedings in Texas;[19]

- Mr. Brann's self-professed addiction to sex, pornography, and masturbation[20] made it unsafe for the child to return to America;

- Mr. Brann's accusations that his wife had used marijuana had no credence. Ms. Guimaraes had submitted to multiple drug tests, all of which showed she had not ingested illegal drugs.[21]

The grandparents were neither a party to the Hague proceeding nor the Texas divorce case.

---

[15]   *Id*. at 14.

[16]   *Id*. at 14.

[17]   *Id*. at 15.

[18]   *Id*. at 17.

[19]   *Id*. at 17.

[20]   *Id*. at 18.

[21]   *Id*. at 22.

In the Texas proceedings, a Harris County judge found Ms. Guimaraes violated a court order by not appearing at her deposition, and granted Mr. Brann's sanctions request, striking all of Ms. Guimaraes's pleadings.[22] After a trial where Ms. Guimaraes could not put on evidence, her counsel could only cross-examine witnesses, a Texas judge ruled in favor of Mr. Brann on issues of custody, child support, and related damages.[23]

Mr. Brann has appealed the decision reached pursuant to the Hague Convention, and every other Brazilian court ruling.  Brazilian appellate courts have denied Mr. Brann's appeal of the Hague Convention proceeding,[24] leaving the federal decision in place.  Mr. Brann's only remaining appeal of the Hague Convention proceeding is to the Brazilian Supreme Court on constitutional grounds.[25] Ms. Guimaraes appealed the Texas trial court's decision, which will be decided by submission after May 18, 2018.[26]

Throughout proceedings in Texas and Brazil, Mr. & Mrs. Guimaraes remained domiciled in Brazil, lawfully respecting the Hague Convention proceeding and the Brazilian court orders although they were not a party to either proceeding.   The couple has never had legal custody of their grandson, nor have they requested it.

On December 16, 2015, five months after the Brazilian federal judge had denied Mr. Brann's request for the immediate return of his son, Mr. Brann met with the FBI to initiate criminal charges.   In March 2017, the Government obtained a sealed criminal complaint against the Guimaraes.[27]  On February 7, 2018, the FBI arrested Mr. & Mrs. Guimaraes when they departed

---

[22]   Exhibit 8, Granting Sanction, dated February 14, 2015.

[23]   Exhibit 9, Brann/Guimaraes Modified Amended Final Decree of Divorce, dated November 5, 2015.

[24]   Exhibit 10, Affidavit of Marcela De Deo Fragoso.

[25]   Exhibit 10 at 3.

[26]   Exhibit 11, First Court of Appeals Notice of Submission, dated February 21, 2018.

[27]   D.E. 1.

from a plane in Miami, Florida.  Agents arrested the couple as they proceeded to a connecting flight to Houston to visit family. Two weeks later, a federal grand jury indicted the couple and Ms. Guimaraes on charges of international parental kidnapping and conspiracy to commit international parental kidnapping.[28]

Count Two of the Indictment alleges, in part, that the Guimaraes "did knowingly remove" the child "from the United States and did knowingly retain said child (who had been in the United States) outside of the United States with intent to obstruct the lawful exercise of parental rights by the father," Mr. Brann.[29]  Similarly, the conspiracy charge hinges on allegations that Mr. & Mrs. Guimaraes conspired with their daughter to unlawfully remove and retain the child in an effort to obstruct Mr. Brann's parental rights.

Under Rule 12(b)(1),[30] Mr. & Mrs. Guimaraes ask that this Court recognize a defense established as a matter of law:  Uncontested facts demonstrate they did not remove, nor have they retained, their grandson in Brazil.  Decisions about the boy's home have been made by his legal guardian—his mother—not Mr. & Mrs. Guimaraes.  Mr. & Mrs. Guimaraes also file this motion to dismiss under Rule 12(b)(3)(B)(v) because the Indictment fails to state an offense since § 1204(d) prohibits prosecution of this case.  Dismissal of the Indictment is also appropriate because of the ambiguous statutory language in § 1204(d).  Such ambiguity permits this Court to examine the Act's legislative history, which shows Congress never intended for this law to criminalize the

---

[28]   D.E. 5.

[29]   *Id*. at 5.  The Indictment alleges the Guimaraes's acts violated § 1204(a) and 2.  § 1204 contains subsections of (a), (b), (c), and (d).  Only subsections (b) and (c) contain numbered subparts. The law has no sub-section 2 nor is there a sub-part 1204(a)(2).

[30]   In the alternative, if the Court finds this argument cannot be made raised Rule 12(b)(1), the argument is raised under Rule 12(b)(3)(B)(v).

conduct of individuals who had abided by Hague Convention proceedings, which recognized an individual's right to keep a child outside of the United States.

## II.     LEGAL STANDARDS

A defendant may move before trial to dismiss an Indictment if the pleading fails to state an offense.[31]   Additionally, "a party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits.[32]

### A.       Federal Legal Standards

Mr. & Mrs. Guimaraes's arguments about the Indictment go to whether an offense is charged.[33] The question of whether the government has charged an offense goes to "the merits of the case,"[34] and the district court has the power to determine "whether the offense charged is a true offense."[35]

"Ordinarily, a motion to dismiss an indictment for failure to state an offense challenges the sufficiency of the indictment itself, requiring the court to take the allegations of the indictment as true and to determine whether an offense has been stated."[36]

> In testing the sufficiency of an indictment, a court must not pierce the pleadings and make a premature resolution of the merits of the allegations.  Rather, as when confronted with a motion to dismiss a civil complaint for failure to state a claim, the court must look to the allegations and, taking the allegations to be true, determine whether a criminal offense has been stated.[37]

---

[31]   FED. R. CRIM. PROC. 12(b)(3)(B)(v).

[32]   *Id*. at 12(b)(1).

[33]   *United States v. Kaluza*, 780 F.3d 647, 655-56, n. 20 (5th Cir. 2015).

[34]   *Id*. at 655-56, n. 21 (citing to *United States v. Cotton*, 535 U.S. 625, 631 (2002)).

[35]   *Id*. at 655-56, n. 22.

[36]   *United States v. Hogue*, 132 F.3d 1087, 1089 (5th Cir. 1998) (citing *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1082 (5th Cir. 1978)).

[37]   *Cadillac Overall Supply Co.*, 568 F.2d at 1082 (internal citations omitted).

When construing criminal statute's language, "[t]he starting point in discerning congressional intent is the existing statutory text. . . ."[38] "'When faced with questions of statutory construction, we must first determine whether the statutory text is plain and ambiguous and if it is, we must apply the statute according to its terms.'"[39] "'For the language to be considered ambiguous, however, it must be susceptible to more than one reasonable interpretation or more than one accepted meaning.'"[40]

The Supreme Court has an established practice of resolving questions concerning the ambit or scope of a criminal statute in favor of lenity.[41]   This practice is rooted in the fundamental principles of due process, which hold that no individual be forced to speculate whether her conduct is prohibited, at the peril of indictment.[42]

§ 1204(a), the statute under which the Government prosecutes Mr. & Mrs. Guimaraes, states:

> Whoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be fined under this title or imprisoned not more than 3 years, or both.

§ 1204(c) defines three limited affirmative defenses to the crime.  § 1204(d) states that the law "does not detract from The Hague Convention on the Civil Aspects of International Parental Child Abduction, done at The Hague on October 25, 1980."

---

[38]   *Kaluza*, 780 F.3d at 658-59 (internal quotations omitted).

[39]   *Id.* (quoting *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013)).

[40]   *Id.* (quoting *Carrier v. Jobs.com Inc.*, 393 F.3d 508, 518-19 (5th Cir. 2004)).

[41]   *Dunn v. United States*, 442 U.S. 100 (1979).

[42]   *Id.* at 112.

### B.   The Hague Convention Standards

The Convention on the Civil Aspects of International Child Abduction, completed at The Hague on October 25, 1980 (the "Hague Convention"), established legal rights and procedures for the return of children improperly removed or retained by a parent.[43] Congress found that under the Hague Convention:

> Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned <u>unless one of the narrow exceptions set forth in the Convention applies</u>. The Convention provides a sound treaty framework to help resolve the problem of international abduction and retention of children and will deter such wrongful removals and retentions.[44]

Congress enacted the International Child Abduction Remedies Act in 1988 to implement the Hague Convention in the United States.[45] The Hague Convention does not apply, however, to non-signatory countries.[46] This forced nations such as the United States to take unilateral legal action to assist the return of abducted children from non-signatory countries.[47]

In December 1992, only 28 countries had signed onto the Hague Convention.[48]  As of 2018, 98 countries have adopted the Hague Convention.  When Congress first considered § 1204, the law was to serve as a stopgap measure for countries that were not signatories to the Hague Convention.[49]   That is evident from speeches given by the bill's sponsors as it was introduced in 1989 and re-introduced in 1991 and 1993.[50]

---

[43]   *See* 22 U.S.C. § 9001(a)(4).

[44]   *Id.* (emphasis added); *see also United States v. Amer*, 110 F.3d 873, 881 (2d Cir. 1997).

[45]   *See Mezo v. Elmergawi*, 855 F. Supp. 59, 61-62 (E.D. N.Y. 1994); see also § 9001 (formerly 42 U.S.C. § 11601).

[46]   The United States and Brazil are signatories to the agreement.

[47]   *See House Report* at 3, 1993 U.S.C.C.A.N. at 2421.

[48]   *See* Exhibit 13, Table of Hague Convention participant countries.

[49]   *Amer*, 110 F.3d at 882-83.

[50]   139 Cong. Rec. H101312-02 (1993) (Comments of Congressman Jim Sensenbrenner); S541 (January 25, 1989) and S7482 (June 11, 1991) (Comments of Senator Alan Dixon).

Even after passing § 1204, "Congress continued to believe that the civil mechanism of the Hague Convention, when available, was the preferred route for resolving the complex and difficult problems surrounding international child abduction."[51]  Today, governmental agencies such as the State Department see the Hague Convention procedures as the first, and primary, mechanism for the return of children to the United States.[52]  According to the State Department, filing of criminal charges should occur only when children are located in a non-Hague partner country, or when a parent has not pursued a Convention case.[53]

An examination of the bill's legislative history also demonstrates a Congress that was, at times, uncertain about how § 1204 would interact along with the Hague Convention.  For example, an early draft included a clause that prohibited prosecutions when a parent had availed themselves of the Hague Convention.[54]  Prior to the bill's passage, Congress heard testimony from State Department experts, who had concerns about the bill's interference with the Hague Convention.[55] When Congress passed the bill, it included a "Sense of Congress" resolution, which states that the Hague convention proceedings "should be the option of first choice for a parent" seeking return of a removed child.[56]  And, President Clinton, upon signing the bill in 1993, issued this statement:

> [The Act] reflects the Congress' awareness that the Hague Convention has resulted in the return of many children and the

---

[51]  *Amer*, 110 F.3d at 882.

[52]  2017 Annual Report on International Child Abduction; https://travel.state.gov/content/dam/NEWIPCAAssets/pdfs/2017%20ICAPRA%20Report%20-%20Final%20(1).pdf (Last visited March 18, 2018).

[53]  *Id*. at 1.

[54]  When Congress considered the 1989 version of the bill, the proposed legislation contained the following:

(g) No prosecution under this section may be brought against an individual for the removal of a child to a country which is a party to, and is implementing, the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1990.

[55]  Hearing on H.R. 3759 Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 101st Cong. 133 (1990) at 37-38; 54-55. ("Hearing on H.R. 3759").

[56]  Pub. L. No. 103-73, §2(b), 107 Stat. 1998 (1993).

> Congress' desire to ensure that <u>the creation of a Federal child abduction felony offense does not and should not interfere with the Convention's continued successful operation</u>.... [The Act] <u>should be read and used</u> in a manner consistent with the Congress' <u>strong expressed preference</u> for resolving these difficult cases, if at all possible, through civil remedies.[57]

### C.    Cases considering The Hague Convention and § 1204(d)

Federal courts have only examined two instances where a defendant asserted § 1204(d) barred criminal prosecution.[58]   Neither case occurred in the Fifth Circuit.[59] And, neither case presents facts similar to this matter.

In *Amer*, the Second Circuit considered an Egyptian father's challenge to his § 1204 prosecution.[60]  The father took his children to Egypt without permission of the mother, and during his prosecution, he alleged that § 1204 was constitutionally barred due to vagueness and overbreadth.[61]   Amer also argued that the district court had erred by not permitting him to raise "certain 'affirmative defenses'" found in the Hague Convention during the trial."[62]  Amer asserted that when the district court had not permitted him to raise these Hague Convention defenses,[63] the prosecution had violated § 1204(d).

---

[57]   Statement by President Clinton upon Signing 18 U.S.C. § 1204, 29 Weekly Comp. Pres. Doc. 2493 (Dec. 6, 1993), *reprinted in* 1993 U.S.C.C.A.N. at 2424–1 (emphasis added).

[58]   A third case, *United States v. Cummings*, involved a Hague Convention civil ruling and a § 1204 prosecution. 281 F.3d 1046 (9th Cir. 2002).  This case was argued, and decided, on Constitutional grounds. The defendant alleged the Commerce Clause did not permit for the law.  *Cummings*, 281 F.3d at 1048–52.  The Ninth Circuit disagreed. *Id*. at 1053–54.

[59]   There appears to be three cases within the Fifth Circuit that examine prosecutions under § 1204. *Anderson v United States*, No. 3–90–0165–H, 2001 WL 180140 (Feb. 16, 2001 N.D. Tex.) (unpublished); *United States v Clenney*, 434 F.3d 780 (5th Cir. 2005); *Blassingame v Blassingame*, No. 09–2117, 2010 WL 2816469 (July 15, 2010 W.D. La.) (unpublished).  None consider § 1204(d)'s language.

[60]   110 F.3d at 873.

[61]   *Id*. at 877.

[62]   *Id*. at 877.

[63]   The Hague Convention relies upon a different set of criteria from § 1204 to determine whether removal of a child was "wrongful" and excuses the conduct under several different reasons that diverge from the three limited

For *Amer*, the Second Circuit closely examined The Hague Convention's purpose and the legislative history of § 1204.  The Second Circuit held Amer's argument had no merit since: 1) Egypt had not entered into the Hague Convention; and thus, 2) Amer's wife could not avail herself of the Hague Convention's civil mechanisms.[64]  Because of this, the court held the prosecution could not "detract from" the Hague Convention and that § 1204 had fulfilled the "'enforcement-gap-closing' function for which [the law] was partially enacted."[65]

The Second Circuit specifically noted, however, there would be a "close question whether a defendant should be permitted to raise Hague Convention defenses when, for instance, there is a parallel or ongoing civil proceeding under the Convention and its implementing legislation."[66] Thus, the Second Circuit concluded that § 1204(d) could hinder the prosecution of a defendant if a court had permitted that defendant to retain a child due to the Hague Convention, or if the Hague Convention proceedings were not complete.

The second case occurred in the Ninth Circuit when an Italian father argued that because his American wife had successfully availed herself of Hague Convention proceedings, his federal prosecution violated § 1204(d).[67]  In this case, an Italian court had ordered the child returned to her mother in America pursuant to the Hague Convention.[68]  This only occurred after Italian authorities

---

affirmative defenses under § 1204(c).  *See* Hague Convention on the Civil Aspects of International Parental Child Abduction, Ch. III.

[64] *Id*. at 882.

[65] *Id*.

[66] *Id*. at 883.

[67] *United States v. Ventre*, 338 F.3d 1047, 1048–49.

[68] *Id*. at 1049.

stepped in to remove the child from the father's home.[69]  The Government arrested and prosecuted the father under § 1204 when he eventually returned to the United States.[70]

Ventre argued that his prosecution had violated § 1204(d) because the proceeding[71] "may limit the effectiveness of other countries' participation in the Hague Convention with the United States."[72]   The Ninth Circuit, without offering any reasoning, held § 1204(d) was "not ambiguous."[73]  And, that court simply concluded that "Ventre's contention that applying the statute to him detracts from the Hague Convention because he already participated in Hague Proceedings is without merit."[74]

The Ninth Circuit also held that § 1204 did not prohibit prosecution of an alleged kidnapper who had participated in Hague Convention proceedings, and cited to *Cummings*, which had not considered arguments relating to § 1204(d).[75]

Ventre's civil proceedings had completed in Italy, and the Italian courts had ordered the return of his daughter.  The Ninth Circuit, therefore, did not consider the effect of § 1204(d) on a case in which: 1) A parent was not ordered to return a child to America; or, 2) the parallel Hague Convention case was still proceeding.  The Ninth Circuit issued *Ventre* in 2003. No other federal criminal case appears to cite *Ventre* for the court's holdings regarding § 1204(d).

---

[69]  *Id*. at 1049–50.

[70]  *Id*. at 1050.

[71]  Ventre raised this argument in a motion to dismiss due to subject matter under Rule 12(b)(2).  2002 WL 32154054, *2.  It does not appear, however, that Ventre raised arguments regarding an affirmative defense under Fed. R. Crim. Proc. 12(b)(1). *Id.*

[72]  *Id*. at 1052–53.

[73]  *Id*.

[74]  *Id.*

[75]  *Cummings*, 281 F.3d at 1048–52.

III.    **ANALYSIS**

      a.    **As a matter of law, this Court must dismiss the Indictment against Mr. & Mrs. Guimaraes because the couple bears no legal responsibility for their grandson's travel or residence, and they lawfully respected orders of a Hague Convention proceedings.**

While the Indictment contains unproven assertions that constitute questions of fact, there are several uncontested, important facts the Indictment fails to mention.  Such unchallenged facts, when considered in light of the charges against Mr. & Mrs. Guimaraes, demonstrate a valid defense as a matter of law.[76]

Generally, defensive theories are considered a matter for the jury at trial.  But, the Supreme Court has held that Rule 12(b)(1) permits assertion of a defense as a matter of law when facts are uncontroverted and a jury determination is not required.[77]

Here, it is uncontested that:

1.    Mr. & Mrs. Guimaraes are not a party to the Texas divorce case involving Ms. Guimaraes and Mr. Brann and, therefore, were not a party to the Agreement under which the Texas court permitted Ms. Guimaraes to bring her son to Brazil;[78]

2.    Mr. & Mrs. Guimaraes are not a party to the Brazilian Hague Convention proceeding commenced by Mr. Brann;[79]

3.    Mr. & Mrs. Guimaraes are not a party to the Brazilian custody challenges raised by Ms. Guimaraes;

4.    Mr. & Mrs. Guimaraes are Brazilian and American citizens, and they are equally bound by the determinations of the Brazilian courts as they are by § 1204;

5.    No court has concluded that Mr. & Mrs. Guimaraes interfered with any of the above-mentioned legal proceedings;

---

[76]    In the alternative, Mr. & Mrs. Guimaraes raise this argument under Rule 12(b)(3)(B)(v), asserting that due to the uncontroverted facts discussed within, the Indictment fails to state a valid offense against them.

[77]    *United States v. Covington*, 395 U.S. 57, 59-60 (1969).

[78]    Exhibit 12, *Brann v Brann* docket sheet.

[79]    Exhibit 2.

6.      The Brazilian Hague Convention proceeding denied Mr. Brann's request that his son be returned to the United States and ordered that custody proceedings continue in the Brazilian state court;[80]

7.      The Brazilian Hague Convention proceeding did <u>not</u> conclude, or even mention, that Mr. or Mrs. Guimaraes had played a role in their daughter's retention of her son in Brazil,[81] despite allegations raised by Mr. Brann;[82]

8.      Mr. Brann has lost an appeal of the Hague Convention proceeding;[83]

9.      Mr. & Mrs. Guimaraes have never served as their grandson's legal custodian and they presently have no legally-recognized rights, in Brazil or America, as to his residence;

10.     Mr. & Mrs. Guimaraes's grandson has remained in Brazil because of decisions made by the boy's mother, his custodian, or the Brazilian courts.

The Indictment alleges these grandparents should be convicted because they purportedly conspired with their daughter to kidnap their grandson, and they retained their grandson in Brazil.[84] Yet, what uncontested facts show is that Mr. & Mrs. Guimaraes have been on the sidelines of this six-year legal battle.  The grandparents never had legal rights over the grandson in America. Therefore, the couple could not make binding decisions about his removal to another country.  Nor do they have legal rights to the child in Brazil, his mother has sole custody of the boy, who under a court order, cannot leave the country with anyone other than his mother.[85]     So, these grandparents cannot legally determine whether the boy remains in Brazil.  Although not parties to

---

[80]    Exhibit 2, p. 12.

[81]    Exhibit 2.

[82]    Exhibit 7, p. 6.

[83]    Exhibit 10.

[84]    D. E. 5.  The Indictment's kidnapping charge hinges on the allegation that Mr. & Mrs. Guimaraes unlawfully removed <u>and</u> retained their grandson in Brazil.

[85]    Exhibit 2, p. 31-32 ("Send an Official letter to the Regional Superintendent of the Federal Police, informing that the minor . . . can leave Brazil . . . provided that <u>he is accompanied by his mother</u>, without the previous and express authorization of this Court, but he remains forbidden from leaving Brazil and the metropolitan region of Salvador, <u>with his father or with any other person</u>.") (emphasis added).

the Brazilian proceedings, as residents and citizens of Brazil, the couple must respect the determinations of the Brazilian courts, for which the United States now seeks to punish them.

Uncontroverted evidence shows: 1) The removal of the child from America was under a valid Rule 11 Agreement, and it granted Ms. Guimaraes, not her parents, the right to bring her son to Brazil;[86] 2) The retention of the child in Brazil is due to decisions by his legal custodian, his mother, not his grandparents, and the Hague Convention court order;[87] 3) the Hague Convention proceeding order, denying Mr. Brann's requests, constitutes a valid court decision; and, 4) although they are not parties to the Hague Convention proceeding, Mr. & Mrs. Guimaraes have respected the Brazilian federal court order.

Mr. & Mrs. Guimaraes lacked, and still do, the legal right to make decisions about their grandson's home, travel, schooling, or anything else of import.  Mr. & Mrs. Guimaraes did not avail themselves of the Hague Convention—Mr. Brann did.  And, these grandparents have done nothing but respect the Brazilian court ruling obtained by, and unsuccessfully appealed by, Mr. Brann.  Their role as bystanders in a six-year custody battle does not constitute a prosecutable offense, even under the broad reaches of conspiracy law and § 1204.  The Indictment, therefore, must be dismissed.

> **b.** **The Indictment fails to state an offense because criminal prosecution of the Mr. & Mrs. Guimaraes, whose grandson remains in Brazil under a parallel, on-going Hague Convention proceeding, violates § 1204(d).**

This Court must dismiss the Indictment against Mr. & Mrs. Guimaraes under Rule 12(b)(3)(B)(v) because it does not state an offense against the couple.  The present prosecution

---

[86]   Exhibit 4.

[87]   See, *supra*, note 84.

violates § 1204(d) because it detracts from an on-going Hague Convention proceeding where a Brazilian federal court has ordered that the Guimaraes's grandson remain in Brazil.

An examination of § 1204(d)'s terms allows for the conclusion that the present prosecution "detracts from" the Hague Convention proceedings to which Mr. Brann availed himself. Merriam-Webster defines "detract from" as "to reduce the strength, value, or importance of (something)."[88] The MacMillan Dictionary defines "detract" to mean "to make something less good, attractive, or important."[89] Black's Law Dictionary does not define this term.

In this case, the Government has alleged that Mr. & Mrs. Guimaraes committed a federal offense by complying with court orders issued in the Hague Convention proceeding, and by permitting their grandson, whom they do not have custody of, to remain in Brazil with his mother. Such allegations clearly "reduce the strength" and "importance" of the Hague proceeding, in which the Brazilian court expressly: 1) Permitted Ms. Guimaraes's retention of her son in Brazil under the Hague Convention; 2) denied Mr. Brann's request for his son's return to America with Mr. Brann; and, 3) "determined" that custody of the child be decided in Brazilian state court.[90] The Government's prosecution here amounts to the United States ignoring a valid court order from Brazil because an American citizen, Mr. Brann, did not win.

As cautioned by the Second Circuit in *Amer*,[91] the parallel, on-going Hague Convention proceedings here may bar the Indictment due §1204(d). Such an argument should not be construed as an assertion that criminal laws cannot exist when civil remedies are available. Indeed, there are

---

[88]   https://www.merriam-webster.com/dictionary/detract%20from  (Last visited March 18, 2018).

[89]   https://www.macmillandictionary.com/us/dictionary/american/detract.  (Last visited March 18, 2018).

[90]   Exhibit 2 at 30-31.

[91]   110 F.3d at 882.

dozens of actions where both civil and criminal remedies exist side-by-side:[92] Wire fraud versus civil fraud; the tort of battery versus a federal battery statute; civil murder versus criminal murder. What differentiates § 1204, however, is that other criminal laws do not contain language that specifically states how the criminal law will not "detract from" a similar civil remedy.

Federal courts recognize that a later federal statute can supplant a treaty obligation.[93] This is why Congress added the language of § 1204(d): The law was not intended to supersede Hague Convention proceedings.

*Ventre* is inapplicable to the present case for several reasons. In *Ventre*, an Italian Hague Convention proceeding ordered the child returned to America.[94] When Ventre returned to America, he pled guilty to the kidnapping charges, and reserved his right to appeal only on the issue of subject matter jurisdiction.[95] Here, the Government seeks to prosecute two grandparents— who are not parties to either the Texas litigation or the Brazilian proceedings—whose daughter removed her son to Brazil under a court-authorized Agreement, and whose retention of her son in Brazil was authorized by a Brazilian federal court under the Hague Convention. No court— American or Brazilian—has found that Mr. & Mrs. Guimaraes have violated any orders or interfered with court proceedings. Thus, the Ninth Circuit's logic in *Ventre* is inapplicable to this case's facts. Prosecuting Mr. & Mrs. Guimaraes flies in the face of § 1204(d)'s pledge that the federal kidnaping law will not diminish the value of Hague Convention proceedings.

---

[92] *See e.g. F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 592 (5th Cir.2008) (citing *SEC v. First Fin. Group*, 659 F.2d 660, 666–67 (5th Cir. 1981)).

[93] *Medellin v. Texas*, 552 U.S. 491, 509 n.5 (2008).

[94] *Ventre*, 338 F.3d at 1049-50.

[95] *Id.*

> **c.      This Court must dismiss the Indictment against Mr. & Mrs. Guimaraes because Congress did not intend for § 1204(a) to prosecute individuals who had respected orders from Hague Convention proceedings.**

If this Court does not agree that the plain language of § 1204(d) prohibits prosecution of Mr. & Mrs. Guimaraes, the couple seeks dismissal of the Indictment because the undefined terms of § 1204(d) are ambiguous, permitting for several interpretations.  This ambiguity allows this Court to consider the legislative history of the statute, which demonstrates that Congress did not intend for the statute to be applied in cases such as this one.

Under Fifth Circuit precedent, "[t]he starting point in discerning congressional intent is the existing statutory text . . . .  When faced with questions of statutory construction, we must first determine whether the statutory text is plain and unambiguous and, [i]f it is, we must apply the statute according to its terms."[96]  For language to be considered ambiguous, the Fifth Circuit has held "it must be susceptible to more than one reasonable interpretation or more than one accepted meaning."[97]  If the statute meets this criteria, then a court may examine the statute's legislative history to consider Congress's intent when drafting the ambiguous terms.[98]

§ 1204(d)'s ambiguity stems from its statement that "This section does not <u>detract</u> <u>from</u> The Hague Convention . . ."  Here, ambiguity clearly exists about the phrase "detract from the Hague Convention."  This is because two differing, reasonable, interpretations exist.  One interpretation is that of Mr. & Mrs. Guimaraes, who know first-hand how the Government's decision to prosecute them reduces the value, and directly contradicts, the Hague Convention proceeding.  The other interpretation is that of the Government, which, based on the Indictment,

---

[96]  *Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015) (internal citations and quotations omitted).

[97]  *Id*. at 658–659.

[98]  *Id*.

believes the Guimaraes may be prosecuted despite their adherence to orders of a Hague Convention proceeding.[99]

Congress enacted the International Parental Kidnapping Crime Act (hereinafter "IPKCA") with the clear purpose of closing the enforcement gap left open by the fact that, initially, few countries had signed on to the Hague Convention.[100] Legislative history dating back to 1989,[101] shows that Congress enacted the IPKCA to deter parents from removing and retaining their children in "safe haven", non-signatory countries.[102] There is no instance in the Congressional record where legislators envisioned the IPKCA as a second bite at the apple, when a parallel on-going Hague Convention proceeding had ruled against an American, such as in Mr. Brann's case.

---

[99]   To the extent that the Court determines that "detract from" leads to an ambiguity in the statute, this is a political question which Congress has committed to the Secretary of State through the Sean and David Goldman International Child Abduction Prevention and Return Act of 2014 (the "Goldman Act"). PL 113-150, 128 Stat. 1807 (2014).  The Goldman Act (the "Act") stemmed from a child custody battle arising out of Brazil between 2004 and 2009.  In the Goldman Act, Congress empowered the Secretary of State to impose sanctions against countries that the Secretary of State found to be in violation of the Hague Convention.  *Id.*   Under the Act, "[e]ach year, the Secretary of State shall submit to the appropriate congressional committees an Annual Report on International Child Abduction."  22 U.S.C. § 9111.

This Annual Report has a wide range of requirements, all of which are devoted solely to the Secretary of State.  If any doubt existed that § 1204 may detract from the Hague Convention, the Department of State's official guidance on pressing criminal charges clarifies that by stating: "Depending on the circumstances, **criminal charges filed against the taking parent can either help or hinder the successful return of your child**.  Therefore, it is important to weigh the pros and cons carefully and to obtain legal advice from an attorney before making the decision that you believe is best for your child." https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/legain-info-for-parents/pressing-criminal-charges.html        (Last visited March 20, 2018.).

The political question doctrine applies equally in criminal cases as it does in civil cases.  *United States v Holiday*, 70 U.S. 407, 419 (1865).  Where the political question doctrine has been applied to criminal cases, such as in *Holiday*, the Court must accept the political stance of the branch with jurisdiction over the matter as a factual determination.  Where the Secretary of State expressly states that the § 1204 prosecutions effects proceedings under the Hague Convention, the Department of Justice cannot take the contrary position that the IPKCA does not "detract from The Hague Convention."

[100]  *Amer*, 110 F.3d at 881-82.

[101]  139 Cong. Rec. H101312-02 (1993) (Comments of Congressman Jim Sensenbrenner); S541 (January 25, 1989) and S7482 (June 11, 1991) (Comments of Senator Alan Dixon).

[102]  *Id.*

"[§ 1204] reflects the Congress' awareness that the Hague Convention has resulted in the return of many children and the Congress' desire to ensure that the creation of a Federal child abduction felony offense does not and should not interfere with the Convention's continued successful operation."[103]   President Clinton's signing statement is clear:   Congress intended for § 1204 to apply to countries that were *not* signatories to the Hague Convention.

Others have viewed the IPKCA as being enacted to serve an "enforcement-gap-closing"[104] function.  For example, a guide for the judiciary notes:

> In 1993, Congress enacted the International Parental Kidnapping Crime Act (IPKC), 18 U.S.C. § 1204 (1993).  This act provides felony criminal penalties for the removal or retention of a child from the United States with the intent to obstruct the lawful exercise of parental rights.  Because the 1980 Hague Convention is only applicable when the treaty is in force between the two countries involved, IPKCA fills a void in the law regarding child abductions from the United States to a country where the 1980 Convention is not in force with the United States.[105]

During initial hearings on the IPKCA, when the law's concept surfaced in 1989, experts argued against the criminalization of international child abductions involving Hague Convention signatory countries.  This was because of a fear that pending criminal charges might affect the willingness of the courts of the country where the child is located to order the return of the child pursuant to the Hague Convention.[106]   For this reason, Congress later drafted subdivision (d) to state:  "This section does not detract from the Hague Convention on the Civil Aspects of International Parental Child Abduction, done at the Hague on October 25, 1980."

---

[103]   1993 U.S.C.C.A.N. 2424-1 (1993).

[104]   *Amer*, 110 F.3d at 882.

[105]   Hon. James D. Garbolino, THE 1980 HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION: A GUIDE FOR JUDGES, FJC-MISC-2012-9, n.1 (2012).

[106]   *See International Parental Child Abduction Act of 1989: Hearing on H.R. 3759 Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary*, 101st Cong., 2d Sess. at 38-41 (statement of Peter Pfund) (1990).

This Court should not rely upon *Vente's* flawed reasoning as to Congress's intent when considering the present Indictment.  First and foremost, the procedural posture of *Ventre* differs: The case was a post-conviction appeal based on a lack of subject-matter jurisdiction argument.[107]  As noted in *Kaluza*, however, the attack lodged here is "whether an offense is charged."[108]  Such a challenge "goes to 'the merits of the case,' and the district court has the power to determine 'whether the offense charged is a true offense.'"[109]

Second, *Ventre's* examination of legislative history is unreliable because of its limited scope.  The Ninth Circuit's decision did consider that a previous draft of the IPKCA "included a provision prohibiting prosecution against individuals who remove a child to a Hague participating country."[110]  The court's examination also entirely failed to consider how the landscape of the Hague Convention had changed from 1990 (when the draft bill included that language was included) to 1993 (when the bill was executed).   Nor did *Ventre* examine all of the expert testimony offered before Congress between 1989 and 1993, much of which warned about the harms of criminalizing custody cases in which there existed on-going Hague Convention proceedings.[111]

The Ninth Circuit's consideration of legislative history was also unsound because it completely ignored President Clinton's signing statement.  This proclamation emphasized that § 1204 "should be read and used in a manner consistent with the Congress' strong expressed

---

[107]   338 F.3d at 1050.

[108]   780 F.3d at 655-56.

[109]   *Id.* (quoting *Cotton*, 535 U.S. at 631, and *United States v. Delgado-Garcia*, 374 F.3d 1337, 1342 (D.C. Cir. 2004)).

[110]   338 F.3d at 1053.

[111]   *See e.g. International Parental Child Abduction Act of 1989: Hearing on H.R. 3759 Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary*, 101st Cong., 2d Sess. at 38-41 (statement of Peter Pfund) (1990).

preference for resolving these difficult cases, if at all possible, through civil remedies."[112] Similarly, *Ventre* ignored statements from legislators who had viewed the law as a "stop-gap" measure for non-Hague Convention cases.[113] Such a limited consideration of the legislative history makes *Ventre* inapplicable here.

Construing § 1204(d) as permitting prosecution in a case such as this one, disregards the legislative intent behind the statute and leads to an absurd result: The civil remedies afforded to Ms. Guimaraes under the Hague Convention give rise to one result, but criminal penalties under § 1204 lead to another. Allowing the loser in a Hague Convention proceeding to file criminal charges in his home country, against a party who prevailed in a different country, makes a mockery of the international agreement and would lead to its speedy demise as an effective tool to resolve international child custody disputes. The ambiguity in this criminal statute must be strictly construed and resolved in the favor of lenity:[114] This Court should dismiss the Indictment.

## IV.    CONCLUSION

This Court should dismiss the Indictment against Mr. & Mrs. Guimaraes because the present prosecution is barred by § 1204(d), which states the kidnapping statute shall not detract from proceedings under the Hague Convention. The Indictment specifically diminishes the value of the Hague proceeding as it criminalizes Mr. & Mrs. Guimaraes's respect for court orders issued under the Hague Convention. Similarly, the prosecution in this case stands in direct contrast to Congressional intent when passing the law. § 1204 was enacted to primarily use for criminal proceedings when the Hague Convention was unavailable to parents, not as a second chance for

---

[112]   1993 U.S.C.C.A.N. at 2424–1.

[113]   139 Cong. Rec. H101312-02 (1993) (Comments of Congressman Jim Sensenbrenner); S541 (January 25, 1989) and S7482 (June 11, 1991) (Comments of Senator Alan Dixon).

[114]   *Emmons*, 410 U.S. at 411.

parents whom courts have deemed dangerous or unstable, as is the case here.  Finally, dismissal of the Indictment is entirely appropriate because as a matter of law, Mr. & Mrs. Guimaraes have established that the couple never made binding decisions about the child's travel or home.  Such decisions were made by his legal custodian.  Prosecuting these grandparents for the decisions of their daughter goes beyond the scope of § 1204 and federal conspiracy law.

Respectfully submitted,
**RUSTY HARDIN & ASSOCIATES LLP**

By: */s/ Russell Hardin, Jr.*
        Russell Hardin, Jr.
        State Bar No. 19424
        Jennifer E. Brevorka
        State Bar No. 1725400
5 Houston Center
1401 McKinney Street Suite 2250
Houston, Texas 77010
Telephone: (713) 652-9000
Facsimile: (713) 652-9800
rhardin@rustyhardin.com
jbrevorka@rustyhardin.com

*Attorneys for Defendant*
*CARLOS OTAVIO GUIMARAES*

Jones Walker, LLP
811 Main Street, Suite 2900
Houston, Texas 77002
Phone: (713) 437-1811
Fax: (713) 437-1946

*/s/ James Ardoin*
JAMES ARDOIN
State Bar No. 24045420
SDTX No. 571281
Email: jardoin@joneswalker.com

*Attorney for Defendant*
*JEMIMA DA ROCHA GUIMARAES*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct of the above and foregoing filed via the CM/ECF system which caused service upon all parties on March 20, 2018.

*/s/ Jennifer E. Brevorka*
JENNIFER E. BREVORKA